# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

TOWN OF JONESBORO            CIVIL ACTION NO. 3:17-CV-01589

VERSUS                                 JUDGE TERRY A. DOUGHTY

PITTSBURG TANK AND TOWER
MAINTENANCE CO., INC.           MAG. JUDGE KAREN L. HAYES

## RULING

This is a suit filed by Plaintiff Town of Jonesboro ("Jonesboro") against Defendant Pittsburg Tank and Tower Maintenance Co., Inc. ("Pittsburg Tank") alleging that Pittsburg Tank breached a contract to perform maintenance services (the "Project") on a Jonesboro municipal water tank and tower (the "Water Tower").

Pending before the Court is Pittsburg Tank's Motion for Summary Judgment [Doc. No. 32]. Jonesboro has filed an Opposition [Doc. No. 36], and Pittsburg Tank has filed a Reply [Doc. No. 37]. For the following reasons, the Motion for Summary Judgment is DENIED.

## I. FACTS

Pittsburg Tank maintains and refurbishes storage tanks nationwide for both private and governmental entities. James Bradford ("Mayor Bradford") was elected Mayor of Jonesboro in 2014 and assumed office January 1, 2015. On the day he was sworn in, he declared that his number one priority was to try to get the Water Tower repaired. On January 23, 2015, at Mayor Bradford's request, Pittsburg Tank inspected the Water Tower and found numerous maintenance issues, both cosmetic and functional.

In April, 2015, Mayor Bradford began consulting with Chris W. Patrick, P.E. ("Patrick"), an engineer with the Denmon Engineering firm, regarding the Water Tower maintenance issues. Mayor Bradford asked Patrick to arrange for a second opinion on the Water Tower.

On May 6, 2015, Water Tank Services, LLC ("WTS") inspected the Water Tower and provided a proposal for $450,000 worth of work, including the application of an epoxy/polyurethane exterior coating system. A copy of the proposal was provided to Patrick. Mayor Bradford ultimately rejected WTS's bid.

In July, Pittsburg Tank sent a list of suggested repairs, along with a pricing sheet, to Mayor Bradford. A copy was provided to Patrick.

Jonesboro had no money to pay for repairs; however, Mayor Bradford secured a $100,000 donation from Jonesboro State Bank to pay for work on the Water Tower. Using those funds, Mayor Bradford decided to spend $98,490 on having Pittsburg Tank undertake the following item (hereinafter the "Base Contract"):

> Pressure wash the tank exterior with biodegradable detergent (minimum 3,500 psi at 3.0 gpm) then remove all loose rust and scale with wire brushes and hand scrapers in accordance with SSPC #2 (hand tool cleaning), spot prime and apply one (1) finish coat of alkyd enamel. This will include replacing the existing logo.[1]

In October, 2015, Jonesboro added the following five (5) additional items, totaling $97,485 (hereinafter "Change Order No. 1"):

(1) Three interior items totaling $82,700, as follows:

    a. Sandblast the interior rusted and abraded surfaces to an SSPC SP-10;
    b. Sandblast the remaining surfaces to an SSPC SP7; and
    c. Apply NSF approved epoxy to 8-10 mils.

(2) Two exterior items totaling $14,785 as follows:

---

[1] The bank's logo was installed on the Water Tower as part of the Project.

      a. Adjust the windage rods and riser stay rods as needed; and
      b. Replace the existing roof vent with a vacuum-pressure vent and screen.

Adding this work brought the total contract price to $195,975.

Pittsburg Tank began its work on the Water Tower in December 2015 and completed it in January 2016. At Patrick's suggestion, Jonesboro engaged WTS to inspect Pittsburg Tank's work on the Water Tower. WTS issued an inspection report noting several areas to be addressed (hereinafter "WTS Punch List"). In February 2016, Pittsburg Tank remedied the items noted in the WTS Punch List. Jonesboro, through Patrick, enlisted WTS to confirm that the WTS Punch List items had been addressed. On February 22, 2016, WTS inspected the Water Tower and confirmed that all the missed areas appeared to have been cleaned and coated, and concluded the tank should be ready to sterilize and fill up.

On March 4, 2016, Patrick forwarded WTS's inspection report to Mayor Bradford and that same day Jonesboro issued payment to Pittsburg Tank for the full contract price.

In June 2016, Mayor Bradford noticed that the Water Tower appeared dirty and mildewed. He complained to Pittsburg Tank, who responded that the coating it had applied was providing corrosion protection as intended, that the mildew was forming on top of the coating due to day-to-night temperature cycling, and that the mildew could be removed simply by cleaning with a solution of bleach and water.

Not satisfied with Pittsburg Tank's response, Jonesboro filed a state court petition in the Second Judicial District Court for Jackson Parish, Louisiana, on August 21, 2017, alleging that Pittsburg Tank breached its contract with Jonesboro by not providing adequate maintenance and by providing maintenance which was substandard and below industry guidelines. The petition made specific allegations that there were rust blooms and light spots in the finish coat in areas in

the interior of the tank and that exterior areas of the Water Tower needed cleaning, priming, and painting. Jonesboro requested judgment against Pittsburg Tank in the full sum of $195,325, plus interest, penalties, reasonable attorneys' fees, costs, and all damages the court deemed appropriate. Pittsburg Tank removed the case to this Court on December 7, 2017.

Pending before the Court is a Motion for Summary Judgment [Doc. No. 32] filed by Pittsburg Tank on the grounds that it fully performed its obligations under the contract.

The motion is fully briefed, and the Court is prepared to rule.

## II. LAW AND ANALYSIS

### A. Standard of Review

Under Federal Rule of Civil Procedure 56(a), "[a] party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be . . . disputed must support the assertion by . . . citing to particular parts of materials in the record . . . ). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving

party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson*, 477 U.S. at 248.)

### B. "New and Unpled" Theories

Pittsburg Tank argues that it is entitled to summary judgment because it performed the work as contracted, Jonesboro accepted the work, and Jonesboro then paid it for that work. Pittsburg Tank further argues that throughout the process, Jonesboro was advised by its own civil engineer, Patrick, and utilized the services of a third party inspector, WTS, to independently confirm that it performed the work according to the contract. Pittsburg Tank contends that all of the specific complaints Jonesboro set forth in its petition derived directly from the WTS Punch List, which it says it indisputably remedied in February 2016, prior to Jonesboro paying it in full.

Pittsburg Tank then argues that because Jonesboro cannot meet its burden on summary judgment with respect to any claim alleged in its state court petition, it anticipates that Jonesboro will oppose the motion for summary judgment based on an "entirely unpled theory of liability." [Doc. No. 32-24, p.11]. Specifically, it asserts that Jonesboro will try to "spin" some claim that Pittsburg Tank should have used or offered to use a more expensive, mildew-resistant coating on the Water Tower, or that Pittsburg owed some duty to inform Jonesboro that the coating it used on the Water Tower was "prone" to mildew. [*Id.*] Pittsburg Tank contends that Jonesboro's petition did not provide it fair notice of any theory related to the type of coating used, because it contains

5

no references to improper materials or a duty to inform about mildew, and in fact, the word "mildew" does not even appear in it.

Jonesboro responds that its petition clearly provides notice to Pittsburg Tank that it is being sued for breaching the contract for the work it performed on the Water Tower. It points to the allegations in its petition that the parties entered into a contract to furnish materials and perform work on the Water Tower, that several months after this work was completed the outside of the Water Tower began turning blackish or gray, that the work performed by Pittsburg Tank was substandard and below industry guidelines, and that Pittsburg Tank breached its contract by not providing adequate maintenance and that said maintenance was substandard and below industry guidelines. Jonesboro argues that the allegations in its petition are broad enough to allow it to produce evidence that Pittsburg Tank breached the contract by not complying with the industry standards for the exterior coating of water tanks, by painting the tank in damp conditions in violation of its written proposal which likely caused or at least contributed to the premature mold development, by applying only a single coat of alkyd enamel which caused premature mold and mildew development when applied to the exterior of a water tank that facilitates condensation, and by misleading it into believing it would receive a satisfactory result.

In its Reply Brief, Pittsburg Tank asserts that Jonesboro has created yet another new theory, set out for the first time in its Opposition, that Pittsburg Tank improperly painted the Water Tower in damp conditions. [Doc. No. 37, p. 6]. Pittsburg Tank concludes that pleadings should matter and should mean something, that discovery has concluded and trial is fast-approaching, and, therefore, Jonesboro should not be permitted to expand the pleadings in this manner.

The Federal Rules of Civil Procedure do not require the plaintiff to plead the specific factual elements of its claim. *Conley v. Gibson*, 355 U.S. 41 (1957). The liberal discovery

procedures, pretrial procedures and the summary judgment procedures prevent surprise evidence. *Swierkiewicc v. Sorema N.A.,* 534 U.S. 506 (2002). The rules require only a "short and plain statement of the claim showing that the pleader is entitled to relief . . ." FED. R. CIV. P. 8(a)(2).

The Court finds that Jonesboro's petition, as expanded upon by the discovery process, provides adequate notice of the claims at issue.

**C.    Genuine Issues of Material Fact**

Jonesboro's petition seeks the full sum of $195,325, which includes a claim of $97,485 for Change Order No. 1. Pittsburg Tank contends that the Court should summarily dismiss this claim because Jonesboro has not alleged any facts or produced any evidence in discovery regarding any problems with respect to its work on Change Order No. 1.

Pittsburg Tank further asserts there are at least ten (10) independent reasons why it should be granted summary judgment:

> (1) The alkyd enamel it used is a perfectly capable coating material. It is approved by the AWWA for use on such tanks, and is recommended by Sherwin Williams for that very purpose;
>
> (2) The alkyd enamel it used is functioning properly and adhering well to the Water Tower, thus there is no defect with the materials it used;
>
> (3) The mildew on the Water Tower is a purely asthetic issue. It is not impacting its function or the safety/quality of the town's water supply;
>
> (4) Pittsburg Tank never made any assurances about mold or mildew growth to Jonesboro during the formation of the contract for the Project;
>
> (5) Jonesboro should have consulted with its engineer, Patrick, regarding the alkyd enamel proposed to be used by Pittsburg Tank prior to engaging it to work on the Water Tower;
>
> (6) Pittsburg Tank had no duty to warn Jonesboro of the possibility of mildew;
>
> (7) Jonesboro rejected a bid from WTS to use the exact type of coating it now says Pittsburg Tank should have used (epoxy/polyurethane), but Jonesboro accepted its proposal over WTS's because its bid was lower;

(8) The epoxy/polyurethane system Jonesboro suggests should have been used would have cost Jonesboro substantially more—as much as $40,000-$50,000—than the system used by Pittsburg Tank in 2015. Jonesboro did not have the funds to pay for this system at the time;

(9) The mildew can be removed through simply washing the Water Tower at a fraction of the cost required to re-coat the Water Tower, which is precisely what Sherwin-Williams initially recommended. Re-coating the Water Tower is unnecessary to restore an aesthetically-pleasing appearance; and

(10) There is no coating system in the world that will repel mildew indefinitely. All coatings are susceptible to mildewing over time due to exposure to weather, humidity, and the outside environment. Jonesboro cannot show that its Water Tower would be mildew-free, or any better looking today, had Pittsburg Tank used a different coating system in 2015.

Jonesboro responds to these contentions with citations to depositions and affidavit testimony. The depositions of Patrick and Eric Zimmerman ("Zimmerman"), a Sherwin Williams employee Jonesboro brought in to investigate the discoloration of the tank and the use of Sherwin Williams paint on the tank by Pittsburg Tank, have established that applying a single coat of alkyd enamel to an exterior water tank does not comply with any industry (American Water Work Association) standard because use of alkyd enamel would require a **three or four coat** system in order to comply. Jonesboro also argues that the deposition testimony of Zimmerman and Hugh Haire, Vice President of Operations for Pittsburg Tank ("Haire"), establishes that applying the alkyd enamel coat in damp and foggy conditions violated the terms of Pittsburg Tank's proposal and caused or contributed to premature mold and mildew development and violated the application conditions of the alkyd enamel product. Mayor Bradford avers that Pittsburg Tank applied paint to the tank in foggy, damp conditions.

Jonesboro also relies on Zimmerman's testimony that alkyd enamel coating should not be recommended for application on an exterior water tank which is prone to developing condensation,

that alkyd enamel will not retard the development of mold and mildew, and that a paint with a mildewcide additive would prevent mold and mildew growth for at least 5 years.

Jonesboro contends that Pittsburg Tank's representative Christy Anglin ('Anglin") expressly represented to Mayor Bradford that the work by Pittsburg Tank on the Water Tower located in the center of town would provide him with a water tank that he could be proud of for many years to come. However, the enamel coating is not functioning properly and within only a few months the tank developed a visibly unsightly mold problem that should cause concern to any reasonable individual who receives their drinking water from the tank. Zimmerman admitted that if he were mayor of a small town in Louisiana, he would not want a water tower to look like it does.

Both Zimmerman and Patrick state that the town should have been made aware of the possibility of mildew with the type of paint system Pittsburg Tank used.

Jonesboro asserts that the bid received from the other company was over two times the bid received from Pittsburg Tank because the other company conducted testing of the existing paint and determined that it contained lead and therefore the other company's proposal included total containment while cleaning the tank; whereas Pittsburg Tank's testing allegedly showed no lead contained in the existing paint and therefore total containment was not required in Pittsburg Tank's bid.

Jonesboro further states it had no legal obligation to consult with an engineer regarding Pittsburg Tank's proposed work.

Jonesboro also contends that, while it is true that the mold can be removed by power washing the tank with a bleach detergent, the single coat of alkyd enamel will allow the mold and mildew to return with a matter of months unless a proper coating system is applied. Remediation

9

of the tank requires power washing the tank with a solution containing a bleach detergent, priming the tank and coating the tank with polyurethane, an economical procedure that should have been recommended and performed by Pittsburg Tank. While the alkyd enamel paint applied by Pittsburg Tank has sufficient adhesion to avoid having to sandblast the tank to bare metal, it is clear from the testimony of Zimmerman that Pittsburg Tank's work has not provided any benefit to Jonesboro because the same amount of prep work performed by Pittsburg Tank needs to be repeated to prime and repaint the tank with polyurethane containing a mildewcide.

Jonesboro, therefore, asserts there is a genuine issue of material fact for trial to support an award of the price paid for the exterior prep, prime and paint work, which must be completely redone to provide Jonesboro with a reasonable result, i.e., a tank that does not develop unsightly premature mold and mildew. Jonesboro does not seek to recover from Pittsburg Tank the cost of a more expensive coating but only the return of the funds it paid for application of an improper coating in damp conditions.

In its Reply Memorandum [Doc. No. 37], Pittsburg Tank further argues that it had no duty to warn Jonesboro that the coating system it employed is susceptible to mildew, that there is no evidence Pittsburg Tank even knew the coating system was susceptible to mildew, and that, even if Jonesboro had proposed a more mildew-resistant system, Jonesboro could not have afforded such a system in 2015. Pittsburg Tank also asserts that any statement it may have made about the result being one Mayor Bradford "would be proud of" is much too vague to be construed as a promise that the Water Tower would forever appear aesthetically pleasing or mildew-free.

The Court concludes that there are genuine issues of material fact which preclude summary judgment. These include whether Pittsburg Tank met the AWWA standards in performing its work; whether coating systems not in strict compliance with AWWA guidelines fall below the

industry standards; whether Pittsburg Tank represented a particular outcome to Jonesboro; whether Pittsburg Tank knew or should have known that applying alkyd enamel on a water tower would result in premature unsightly mold and mildew; and whether Pittsburg Tank informed Jonesboro of the adverse consequences of its proposed work and thereby misled Mayor Bradford into believing that Jonesboro would a receive a satisfactory result.

## III. CONCLUSION

For the reasons set forth above, Pittsburg Tank's Motion for Summary Judgment [Doc. No. 32] is **DENIED**.

MONROE, LOUISIANA, this 3rd day of October, 2018.

TERRY A. DOUGHTY
**UNITED STATES DISTRICT JUDGE**